UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BECHTEL DO BRASIL CONSTRUÇÕES LTDA., BECHTEL CANADA CO., and BECHTEL INTERNATIONAL, INC.,<br><br>    Petitioners,<br><br>v.<br><br>UEG ARAUCÁRIA LTDA.,<br><br>    Respondent. | Civil Action No. 1:09-cv-06417 |

**RESPONDENT'S MEMORANDUM IN OPPOSITION TO PETITION FOR
PERMANENT STAY OF ARBITRATION AND IN SUPPORT OF
COUNTER-APPLICATION TO COMPEL ARBITRATION**

Respondent UEG Araucária Ltda. ("UEGA") hereby opposes the Petition for Permanent Stay of Arbitration of Bechtel do Brasil Construções Ltda., Bechtel Canada Co. and Bechtel International Inc. (collectively, "Bechtel") and seeks entry of an order compelling arbitration in accordance with the parties' arbitration agreement.

As explained below, the dispute before this Court arises out of a series of contracts between UEGA and Bechtel (the "Contracts"), pursuant to which Bechtel was to design, construct, test, commission and deliver to UEGA a 469 megawatt gas turbine power plant located at Araucária, Paraná in Brazil (the "Project"). The Contracts contain a broad and mandatory arbitration agreement. In accordance with that agreement, UEGA initiated an arbitration proceeding (the "Arbitration") against Bechtel in the International Court of Arbitration of the International Chamber of Commerce ("ICC") to recover over $20 million in damages stemming from the failure of the Project's steam turbine generator ("STG") in 2008. UEGA requested that the ICC stay the arbitration to allow the parties to discuss settlement.

After engaging in a series of settlement discussions while the Arbitration was in abeyance, Bechtel filed a petition in New York state court to permanently stay the Arbitration (the "Petition"), arguing that all of UEGA's claims are time-barred under applicable statutes of limitations. Essentially, Bechtel is trying to circumvent the parties' arbitration agreement to shop for a forum that will look with favor on its statute of limitations defenses.

Bechtel's position is wholly inconsistent with the Federal Arbitration Act's presumption of arbitrability and with the plain language of the parties' arbitration agreement. In its petition, Bechtel fails to even mention the Federal Arbitration Act, 9 U.S.C. § 1, *et. seq.* ("FAA"), much less explain its outcome-determinative role in this setting. The FAA applies to international contracts such as those involved here and imposes a presumption that statute of limitations disputes are to be resolved through arbitration unless explicit language in the parties' arbitration agreement commands a different result. Here, Bechtel and UEGA agreed that "*any dispute*" relating to the Project, without any explicit exception for statute of limitations disputes, would be resolved through arbitration. This agreement's broad scope is consistent with industry practice to resolve disputes before arbitrators who have experience with large-scale, international power projects. The importance of such experience is underscored here by the fact that Bechtel's Petition explicitly rests on disputed contentions of *Brazilian* law and, if considered on its merits, requires consideration of the Brazilian regulatory framework for operating thermal power plants. For all these reasons, the Court should deny Bechtel's Petition, grant UEGA's counter-application to compel, and send this dispute to Arbitration where it belongs.

Even if this Court were to consider the Petition on its merits, moreover, UEGA's claims are *not* time-barred. The parties' choice of law provisions in the Contracts dictate that New York's six-year statute of limitations applies to UEGA's contract claims. Those claims could not

B3646333.15

have accrued before Bechtel reached "Acceptance," a contractually-defined moment following testing and commissioning of the Project.   Acceptance marked the date when control of and risk for the Project transferred to UEGA.  It also was the date when Bechtel's defect liability period commenced and when Bechtel's risk of incurring liquidated damages for construction or testing delays ended.  Most importantly, Acceptance marked the date upon which the Project was ready to start commercial operation as a utility providing electricity to Brazil's power grid.  All of these events are tied to the commencement of the statute of limitations under New York law and industry usage.  Bechtel admits that Acceptance did not occur until September 27, 2002, which means that UEGA's breach of contract claims were timely when filed with the ICC on September 29, 2008.[1]  As for UEGA's tort claims, the parties reached no agreement as to what statute of limitations periods would govern and it will be up to the arbitrators to decide whether UEGA's arbitration demand, which came less than one year after the STG's failure in 2008, was timely.  Accordingly, the Petition should be rejected on its merits.

## FACTUAL BACKGROUND

### A.    The Project

This matter arises out of a series of contracts executed on or around October 9, 2000 between UEGA and Bechtel aimed at delivering a "turnkey" 469 megawatt gas turbine power plant located at Araucária, Paraná in Brazil.  Umbrella Agreement, Affidavit of Arshad Nawaz ("Nawaz Aff."), Ex. 6 ("Umbrella Agreement"), Recital 1.[2]  The Project was "turnkey" in that

---

[1] September 27, 2008 fell on a Saturday.  Under New York's General Construction Law § 25-a (1), "[when] any period of time, computed from a certain day, within which . . . an act is . . . required to be done, ends on a Saturday, Sunday or a public holiday, such act may be done on the next succeeding business day."  *See, e.g., Conway v. Bd. of Educ. of Century Sch. Dist. No. 1*, 262 N.Y.S.2d 15 (1965) (applying General Construction Law to statute of limitations).  UEGA's Request for arbitration was thus timely filed on Monday, September 29, 2008.

[2] Bechtel submitted Mr. Nawaz's affidavit in support of its state court Petition for Permanent Stay of Arbitration. To avoid exhibit duplication, and for the Court's convenience, UEGA is filing the Nawaz Affidavit and exhibits as

Bechtel and its subcontractors were to deliver, on or before December 1, 2002, a brand new power plant that was tested, commissioned, connected to the Brazilian power grid and ready to commence commercial operations on the day that UEGA assumed control under the Contracts. *See* Site Construction Contract, Nawaz Aff., Ex. 3 ("Site Contract"), Art. 1.1 (defining the Site Contract's "Works").

     **B.**     **The Parties' Agreement to Arbitrate "Any Disputes" Relating to the Project**

The Contracts reflect the parties' intention to resolve Project-related disputes out of court. They require informal negotiations between senior managers and contemplate mediation before either party proceeds to arbitration.  Site Contract, Services Contract, Nawaz Aff., Ex. 4 ("Services Contract"), Equipment Supply Contract, Nawaz Aff., Ex. 5 ("Equipment Contract") (collectively "Contracts"), Art. 36.1-2.  The mediation requirement is waived if one party will not participate in the mediation.  *Id.* at Art. 36.2.

If the parties fail to reach a resolution under Article 36:

> Any dispute, controversy, or claim arising out of or relating to the Contract[s], or the breach, termination or validity thereof . . . shall be finally settled by arbitration in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce [ ] then in effect (the "Rules"), except as these rules may be modified herein.

Contracts, Art. 37.2.  There is nothing in Article 37 that removes particular disputes (such as statute of limitations disputes) from the scope of the parties' agreement to arbitrate.  *See generally*, *id.* at Art. 37.  An arbitration award issued by the ICC arbitral tribunal "shall be final

---

searchable .pdf files, and will cite to the Nawaz Affidavit herein.  While UEGA does not contest the authenticity of the exhibits to the Nawaz Affidavit, it does contest many of Mr. Nawaz's factual averments as set forth herein and in UEGA's Answer to Petition for Permanent Stay of Arbitration.

and binding upon the parties, and shall be the sole and exclusive remedy between the parties regarding any claims, counterclaims, issues or accountings presented . . . ."  *Id.* at Art. 37.2.4.

The ICC arbitral tribunal is to apply New York law when interpreting the Contracts and the meaning of the parties' agreement to arbitrate.  *Id.* at Art. 37.2.2 and Art. 39.1.1.  The Contracts also provide that the tribunal is to apply the ICC's rules except as those rules may be modified by the Contracts themselves.  *Id.* at Art. 37.2, Art. 37.2.2 and Art. 39.1.2.

C.    **The STG Repair Procedures in 2002**

The notice to proceed for the Project was issued in October 2000.  Site Contract, Section 3, at 1 (Pricing Document).  In mid-June 2002, however, ABB Alstom Power Generation AG ("Alstom"), the manufacturer of the Project's STG, notified Bechtel of a potential manufacturing defect in its product.  *See* Nawaz Aff., Ex. 9 (correspondence describing potential lug welding defect).  Specifically, Alstom believed that the Project's STG "lugs" suffered from the same welding defect that had recently caused a failure in an identical STG installed at a United States power plant.  *See id.*  As the Project's STG was already installed, Alstom recommended immediate on-site repair.  *See* Nawaz Aff., Exs. 7 and 8 (Project meeting minutes, STG repair summary and schedule).

Alstom's repair procedures required that the welded joints between the STG's new lugs and the existing phase ring be checked with a "dye-penetrant test."  *See* Nawaz Aff., Ex. 9 (Alstom test procedures).  Such testing evaluates the integrity of a weld joint or seam by revealing any cracks, porosities or improper fusion.  Declaration of Alvaro Fogaca ("Fogaca Decl.") ¶ 21.  Neither Bechtel nor Alstom has ever provided contemporaneous documentation from 2002 specifically confirming that Alstom performed dye-penetrant testing on each of the new lugs and providing the test results.  *Id.*  Instead, Bechtel and Alstom only provided results

from high potential testing ("Hi-Pot Testing"), which evaluates the adequacy of electrical insulation under high voltage but does not address welding integrity.  *Id.*

Final Completion of the Project was achieved on November 15, 2002.  Nawaz Aff. ¶ 15. For reasons unrelated to its design, procurement, construction or testing, commercial operation of the Project did not commence until December 2006.  Fogaca Decl. ¶ 18.

### D.    The STG Failure in 2008

 After less than 8,000 hours of operation, on January 13, 2008, the Project's STG suffered a catastrophic failure.  Fogaca Decl. ¶ 19.  The Project was offline for several weeks while Alstom repaired the STG, resulting in tens of millions of dollars in damages to UEGA. *Id.*; *see* Nawaz Aff. Ex. 1 (Request for Arbitration).

Expert analysis has revealed that the STG failure was caused by deficiencies in the structural integrity of the lug welds, including cracking, porosities and improper fusion.  Fogaca Decl. ¶ 20.  These deficiencies would have been discovered by Alstom had it properly performed the required dye-penetrant testing on the lug welds in July/August 2002.  *Id.* at ¶ 21.

### E.    The Arbitration and Present Action

Under the Contracts, Bechtel is liable for Alstom's "acts, defaults and neglects" as if they were Bechtel's own.  Contracts, Art. 3.3(b).  Accordingly, on September 29, 2008, UEGA filed an ICC Request for Arbitration against Bechtel seeking to recoup the damages caused by the STG failure.  Declaration of Jeffrey Follett ("Follett Decl.") ¶ 3.  The same day, UEGA filed a Request for Stay of the Arbitration to allow the parties to engage in the informal dispute resolution procedures set forth in Article 36 of the Contracts.  *Id.*

The parties attempted to resolve their dispute informally but reached an impasse in 2009. *Id.* at ¶¶ 4-6.  After UEGA indicated that it would resume the Arbitration, Bechtel filed the present action in the Supreme Court of New York seeking a permanent stay that proceeding.  *Id.*

B3646333.15

at ¶ 7.  In addition, Bechtel has stated that it will request a stay of the Arbitration from the ICC arbitral panel pending the outcome of the present action, and will further seek a ruling limiting the scope of the Arbitration to those claims remaining after conclusion of the present action.  *Id.* at ¶ 8.  The ICC's case administrator for the Arbitration, however, has indicated that the ICC is not likely to consider the existence of parallel proceedings to be a reason to stay the Arbitration.  *Id.* at ¶ 9.  UEGA is now in the process of taking the Arbitration out of abeyance.  *Id.* at ¶ 10.

## ARGUMENT

**I.    THE FEDERAL ARBITRATION ACT, THE CONTRACTS AND INDUSTRY PRACTICE ALL REQUIRE THAT TIMELINESS ISSUES BE LEFT TO THE ICC ARBITRATORS**

### A.    The Federal Arbitration Act Applies to the Contracts

The FAA "declare[s] a national policy favoring arbitration," *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 56 (1995), and creates a "body of federal substantive law of arbitrability applicable to any arbitration agreement within the coverage of the Act," *Best Concrete Mix Corp. v. Lloyd's of London Underwriters*, 413 F. Supp. 2d 182, 186 (E.D.N.Y. 2006).  Arbitration agreements that fall under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") are enforced in accordance with Chapter 2 of the FAA.  *Id.*  "An agreement to arbitrate exists within the meaning of the Convention and the FAA if: (1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope."  *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 146 (2d Cir. 2001).  Upon finding that an arbitration agreement meets these requirements, a federal court must compel arbitration of any dispute falling within the agreement's scope in accordance with its terms.  *Id.*

B3646333.15

There can be no legitimate dispute that the arbitration agreement included in the Project Contracts falls under the Convention and the FAA.  The agreement is written and provides that arbitration proceedings will be held in the United States, which is a signatory of the Convention.  *See* Contracts, Art. 39.2 (place of arbitration is New York City, New York).  In addition, the Project and the Contracts were manifestly international in scope:  Bechtel entities in Brazil, Canada and the United States were engaged to design, construct and test a power plant located in Brazil with equipment procured from suppliers all over the world.  Umbrella Agreement, at 1 (listing the parties to the Contracts and their respective citizenships).  The Project and the Contracts were also manifestly commercial, involving "the engineering, design, procurement, transportation, manufacture, construction, installation, commissioning and testing" of a $210 million international infrastructure endeavor, the purpose of which was to provide electricity to Brazil's multi-state power grid.  *Id.* at Recital 1.

In view of these facts, this Court must apply the FAA to the parties' arbitration agreement, *see Siemans Transp. P'ship Puerto Rico, S.E. v. Redondo Perini Joint Venture*, 824 N.Y.S.2d 758 at *7 (N.Y. Sup. Ct. 2006) (contracts to design and build 17 kilometer mass transit system in Puerto Rico executed by Delaware, Massachusetts and Puerto Rican corporations affected interstate commerce and FAA applied); *Metrosvyaz Ltd. v. Whale Telecom Ltd.*, 815 N.Y.S.2d 495 at *3 (N.Y. Sup. Ct. 2006) (project involving "foreign corporations, a site located overseas, and corporations and equipment located in Delaware and California" affected interstate commerce and FAA applied), and compel arbitration of any dispute falling within the scope of that agreement in accordance with its terms.  *Best Concrete Mix*, 413 F. Supp. 2d at 186.

B3646333.15

**B.    UEGA and Bechtel Intended Timeliness and Any Other Disputes To Be Resolved Through ICC Arbitration**

The disputes resolution process in the Contracts demonstrates the parties' intent to resolve all disputes, including statute of limitations issues, *outside* the courtroom.  The process calls for informal negotiation between senior management, followed by mediation if both parties are amenable, followed by arbitration.  *See* Contracts, Art. 36.1-2, 37.1.  The parties' agreement to arbitrate is broad in scope and mandatory:

> *Any* dispute, controversy, or claim arising out of or relating to the Contract . . . that is not resolved pursuant to the informal dispute resolution procedures provided for . . . *shall be finally settled by arbitration* in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce . . . then in effect (the "[ICC] Rules"), except as these rules may be modified herein.

*See* Contracts, Art. 37.2 (emphasis added).  Resolution of any dispute by the ICC was intended to be "*final and binding* upon the parties" and their "*sole and exclusive* remedy"  *See id.* Art. 37.2.4 (emphasis added).

Nothing in the parties' agreement carves timeliness issues out of the ICC arbitrators' authority to resolve "any disputes" relating to the Project.  While it is true that the parties agreed that they could modify the ICC's rules, Contracts Art. 37.2, they did not do so with respect to the scope of the arbitrators' authority.  The parties' agreement that New York law would apply in the arbitration, Art. 37.2.2, is hardly an open invitation for Bechtel to circumvent the entire process by invoking NY CPLR §§ 7502(b) and 7503(b).  Instead, the agreement allows New York law on arbitration procedure to flesh out the comparatively bare bones of the ICC Rules.

For example, the ICC Rules state that arbitration proceedings:

> Shall be governed by these Rules and, where these Rules are silent, by any rules which the parties or, failing them, the Arbitral Tribunal may settle on . . .

ICC Rules, Article 15, "Rules Governing the Proceedings," available at *http://www.iccwbo.org/ court/arbitration/id4093/index.htm*. The ICC Rules are silent on critical issues such as discovery, whether witnesses can be subpoenaed, whether testimony must be sworn, and the applicability of evidentiary rules. New York law on arbitration procedure speaks directly to these issues. *See*, *e.g.*, CPLR § 7505 (authorizing arbitrators to issue subpoenas for documents or witnesses and to and swear oaths); *CSP Tech., Inc. v. Hekal*, 869 N.Y.S.2d 449, 450 (N.Y. App. Div. 2008) (arbitrators not authorized to direct the parties to engage in discovery absent rule of arbitral forum or consent of parties); *Waehner v. Frost*, 770 N.Y.S.2d 596, 598 (N.Y. Sup. Ct. 2003) (arbitrators are not bound by rules of evidence).

The parties intended New York law on arbitration procedures to inform and clarify the ICC Rules, not to supplant the entire arbitration process through application of NY CPLR §§ 7502(b) and 7503(b). *See Porta Sys. Corp. v. Rodriguez Aponte*, No. 00 Civ. 0087, 2000 U.S. Dist. LEXIS 20824, *4-5 (S.D.N.Y. Jan. 20, 2000) (inclusion of New York choice of law provision in arbitration agreement operates to encompass the substantive principles that New York courts would apply, but not special rules limiting the authority of the arbitrators such as CPLR § 7502(b)). There is nothing inconsistent about requiring the ICC arbitrators to apply New York law on arbitration procedure where it informs the ICC Rules, while at the same time allowing the arbitrators to resolve statute of limitations disputes. *See Goldman, Sachs & Co. v. Griffin*, No. 07 Civ. 1313, 2007 U.S. Dist. LEXIS 36674, *8-10 (S.D.N.Y. May 16, 2007) (arbitrator should decide statutes of limitations issues despite choice of law clause that "this agreement and its enforcement shall be governed by the laws of the State of New York"); *Joseph Gunnar & Co., LLC v. Bridgeman*, No. 015603/2006, 2007 N.Y. Misc LEXIS 779 at *3-4 (N.Y. Sup. Ct. March 7, 2007) (same); *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1196, 1199-1200

- 10 -

(2d Cir. 1996) (same); *see also Pellegrino v. Auerbach*, No. 05 Civ. 6909, 2006 U.S. Dist.

LEXIS 9679, *14, *19 (S.D.N.Y. Mar. 7, 2006) (arbitrator should decide timeliness issues

despite two New York choice of law clauses, one generally within agreement and another

specifically within arbitration clause); *Shaw Group, Inc. v. Triplefine Int'l Corp.,* 322 F.3d 115,

121 (2d Cir. 2003) (same); *Diamond Waterproofing Sys. v. 55 Liberty Owners Corp.,* 826 N.E.2d

802, 805-06, (N.Y. 2005) (arbitrator should decide timeliness issues despite New York choice of

law clause); *Smith Barney Shearson, Inc. v. Sacharow*, 689 N.E.2d 884, 888-89 (N.Y. 1997)

(same); *Shearson Lehman Hutton v. Wagoner*, 944 F.2d 114, 121 (2d Cir. 1991) (same).

### C.   Any Ambiguities in the Parties' Arbitration Agreement Must Be Resolved in Favor of Arbitration

Bechtel and UEGA executed an unequivocal agreement to arbitrate "any disputes"

arising out of the Project.  The FAA enforces such unequivocal agreements by requiring courts to

presume that "any doubts concerning the scope of arbitrable issues be resolved in favor of

arbitration."  *Shaw Group*, 322 F.3d at 120 (internal quotations omitted).  This presumption is

strictly applied by federal and state courts to statute of limitations disputes.  *Howsam v. Dean

Witter Reynolds*, 537 U.S. 79, 85 (2002) ("in the absence of an agreement to the contrary . . .

issues of procedural arbitrability . . . such as time limits . . . are for the arbitrators to decide");

*Diamond Waterproofing Sys.*, 826 N.E.2d at 806 (only an explicit agreement to leave timeliness

issues to the court would overcome the presumption that statutes of limitations questions are for

the arbitrator).[3]

---

[3] Bechtel's summary of New York law on the arbitrability of statute of limitations disputes is incomplete and misleading.  Bechtel relies on two authorities, *Smith Barney, Harris Upham & Co., Inc.* v. *Luckie*, 647 N.E.2d 1308, 1313 (N.Y. 1995) and *Coleman & Co. Sec., Inc. v. The Giaquinto Family Trust,* No. 00 Civ 1632 (DC), 2000 WL 1683450, at *4 (S.D.N.Y. Nov. 9, 2000), for its assertion that a New York state court rather than the ICC should determine whether UEGA's claims are time-barred.  Petition at 8-9.  These cases are superseded by the more recent decisions in *Howsam* and *Diamond Waterproofing*, both of which require application of the FAA's presumption of arbitrability to statute of limitations disputes.

B3646333.15

Beyond the FAA's general policy favoring arbitration, the circumstances of this action provide additional reasons for this Court to apply a presumption of arbitrability.  First, ruling on Bechtel's statute of limitations defense would require this Court to engage in substantive contract interpretation, to resolve disputed questions in a developing area of Brazilian law, and to consider the significance of certain completion milestones in the context of the Brazilian regulatory system for thermal power plants.  *See infra* Section II.  These are issues that fall squarely within the scope of the parties' arbitration agreement, and should presumptively be left for the ICC arbitrators to resolve.  *Gunnar*, 2007 N.Y. Misc. LEXIS 779 at *4 (resolution of statute of limitations dispute was for arbitrators where resolution required substantive contract interpretation); *see also Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444 (2003) (whether class action arbitration allowed under arbitration agreement was question of substantive contract interpretation for arbitrators); *Howsam*, 537 U.S. at 84 ("procedural issues which grow out of the dispute and bear on its final disposition are presumptively for the arbitrator").

Second, the parties' intent to resolve any disputes, including statute of limitations issues, through mandatory arbitration is consistent with infrastructure industry practice:

> International arbitration remains the default choice for deciding international project disputes . . . The pre-eminent reason is the New York Convention [which] allows for the enforcement of international arbitral awards in the nation states of the countries who have executed the Convention. . . . [I]n arbitration the parties are able to choose decision makers with knowledge of construction, which is not often available in court proceedings . . . .

CONSTRUCTION LAW HANDBOOK, Richard K. Allen and Stanley A. Martin (2009), 1747-48. Absent specific language to the contrary, there is no reason to conclude that UEGA and Bechtel intended to deviate from industry practice favoring arbitration of all Project disputes.  *Cf. Howsam*, 537 U.S. at 85 (presuming that parties intended arbitrators with substantial experience in securities industry and arbitral forum rules to determine whether claims were timely).

- 12 -

In conclusion, the parties agreed to arbitrate "any disputes" relating to the Project.  The Court should apply that broad language and reject Bechtel's attempt to avoid arbitration.

## II.    IN THE ALTERNATIVE, UEGA'S CLAIMS ARE TIMELY

Bechtel and UEGA agreed that any contract claims relating to the Project would be governed by New York substantive law.  Contracts, Art. 39.1.1.  New York applies a six-year statute of limitations to construction contract claims, CPLR § 213(2), and accrual ordinarily occurs when substantial completion of the work is achieved.  *Superb Gen. Contracting Co. v. City of New York*, 833 N.Y.S.2d 64, 66 (N.Y. App. Div. 2007); *see also City Sch. Dist. v. Hugh Stubbins & Assocs.*, 650 N.E.2d 399, 400 (N.Y. 1995) ("[i]n cases against . . . contractors, the accrual date for Statute of Limitations [sic] purposes is completion of performance").  The parties' statute of limitations dispute here boils down to when Bechtel achieved the equivalent of "substantial completion" under the Contracts.  Bechtel assets that substantial completion was achieved on September 16, 2002, when Mechanical Completion was declared.  UEGA asserts that substantial completion occurred on September 27, 2002, when Acceptance was declared.

Under New York law, UEGA must prevail because of the undisputed fact that UEGA could not take control, assume the risk or enjoy beneficial use of the Project until Acceptance was achieved.  Mechanical Completion bears none of these hallmarks of substantial completion under the Contracts, industry usage or New York law.  UEGA's request for arbitration was thus timely filed within six years of the Project's Acceptance date.[4]  To the extent Bechtel attempts to invoke a purportedly shorter limitations period under Brazilian law, Bechtel's position is inconsistent with the plain language of the Contracts, as well as Brazilian law itself.

---

[4] *See supra* n. 1 regarding New York's weekend and public holiday filing rule.

A.    **UEGA's Contract Claims Are Timely Under New York Law**

At the outset, it is important to emphasize that the "turnkey" nature of the Project sets it apart from traditional construction projects in which an owner contracts separately with a design professional, a builder, suppliers and testing contractors.  In a traditional setting, a builder achieves substantial completion by simply erecting a home, building or other structure.  Under the Contracts, however, Bechtel and its subcontractors were to deliver a newly constructed power plant that was tested, commissioned, connected to the Brazilian power grid and ready to commence commercial operations on the day that UEGA assumed control.  Umbrella Agreement, Recital 1.  To substantially complete the Project, Bechtel not only needed to erect the physical structure of the power plant, but also test and commission it in accordance with Brazilian law to ensure that it would operate properly when control and risk transferred to UEGA.  *See* Fogaca Decl. ¶¶ 6-12 (describing professional and regulatory requirements of testing and commissioning before Project could begin operations).

The Project completion process occurred in three stages -- Mechanical Completion, Acceptance and Final Completion.  Mechanical Completion signified completion of the physical structure of the plant and initial synchronization to the Brazilian power grid such that performance testing could commence safely.  Site Contract, Art. 18.1(a)(i)-(v).  Acceptance signified successful completion of the requisite performance tests for commercial operation, submission of a preliminary punch list,[5] commencement of Bechtel's two-year defect liability

---

[5]  Although Bechtel makes much of the fact that a punch list had been developed by the date of Mechanical Completion, Petition ¶ 32; Nawaz Aff. ¶ 11, that is not dispositive here.  *See Justin Elec. v. Board of Education of Shenendehowa Central School District*, 633 N.Y.S.2d 862, 863 (N.Y. App. Div. 1995) ("The mere fact that some of the work can be characterized as punch list items performed subsequent to a 'substantial completion' date does not preclude the court from considering the work in determining the date upon which the claim accrued.").  In any event, the punch list items related to mechanical work, not to the testing and commissioning that was essential to Acceptance and establishing that the Project was ready for commercial use.

period, and transfer of Project control and risk from Bechtel to UEGA. *Id.* at Art. 18.12(a)-(e).

Final Completion signified completion of all remaining testing and punch list items. *Id.* at Art.

18.14(a)(i)-(iv).

Viewed through the lens of New York law, substantial completion of the Project for

accrual purposes could not have occurred before September 27, 2002 -- the date of Acceptance.

Courts applying New York law look for several markers to identify the date when contract work

was substantially completed. Common markers include: (1) the date upon which an owner

assumes control of and risk for a project, *see State v. Lundin*, 459 N.E.2d 486, 488 (N.Y. 1983)

(accrual occurred when owner fully occupied building, took over building security, and released

contractor's insurance); *City of Glenn Falls v. Crandell Assocs. Architects*, 566 N.Y.S.2d 689,

691 (N.Y. App. Div. 1991) (same); (2) the date upon which liquidated damages can no longer be

assessed, *see Richard H. List, Inc. v. Town of Halfmoon*, 625 N.Y.S.2d 708 (N.Y. App. Div.

1995) (liquidated damages cannot be assessed after date of substantial completion); and (3) the

date upon which a contractor's defects guarantee period begins, *see* 3 Philip L. Bruner & Patrick

J. O'Connor, *Bruner & O'Connor on Construction Law* § 8:35 (2002) (substantial completion

often triggers contractor's defect guarantee period); AIA Document A201 – 1997, Art. 9.8.4

(contract warranties commence on date of substantial completion).

By far, however, the single most important substantial completion marker is the date

upon which a project becomes available for beneficial occupancy or use. *See, e.g.*, *Landow &

Landow Architects, P.C., v. Shorefront Jewish Geriatric Center, Inc.*, 734 N.Y.S.2d 645, 646.

App. Div. 2001) (substantial completion occurs when "the premises [are] occupied for its

intended use") *Bayridge Air Rights, Inc. v. Blitman Constr. Corp.*, 554 N.Y.S.2d 528, 529 (N.Y.

App. Div. 1990) (substantial completion occurred when owner took occupancy of building);

Bruner & O'Connor, *supra,* at § 8:23 ("As a general rule, substantial completion is defined as that point in the construction where the work is sufficiently complete that *the owner may occupy or utilize the work for the use for which it was intended*." (emphasis added)); *see also* Cyril M. Harris, *Dictionary of Architecture and Construction* (2d ed., McGraw-Hill 1993) at 243 (substantial completion is "the date certified by the architect when the work, or a designated portion thereof is sufficiently complete, in accordance with the contract documents, *so the owner may occupy the work or designated portion thereof for the use for which it is intended*.") (emphasis added); AIA Document A201 – 1997 Art. 9.8.1 (1997), (substantial completion is "the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents *so that the Owner can occupy or utilize the Work for its intended use*") (emphasis added).

In this case, UEGA's assumption of risk and control for the Project, *see* Site Contract, Arts. 18.3, 28.1-3; Umbrella Agreement, Art. 15(i), Bechtel's liquidated damages cut-off date, *see* Equipment Contract, Art. 17.9, and Bechtel's defect liability period start date, *see* Site Contract, Art. 20.1,[6] each occurred on the September 27, 2002 Acceptance date. Most significantly, UEGA could not commence commercial operation of the Project as a power plant supplying electricity to the Brazilian power grid until the minimum performance testing that was a prerequisite to Acceptance had been successfully completed. *See* Fogaca Decl. ¶¶ 6-12 (describing regulatory and engineering requirements of testing and commissioning before Project could begin operations); *id.* at ¶ 17 ("As a practical matter, the Araucária Plant would have been useless to UEGA without commissioning."). As Bechtel acknowledges, the results of the

---

[6] To the extent defects guarantee and other provisions of the Contracts purport to limit Bechtel's liability, those limitations will not apply in the event of "Gross Misconduct" under the Contracts or gross negligence under New York law. *See* Contracts Art. 29.1; *Banc of Am. Sec. LLC v. Solow Bldg. Co. II, L.L.C.*, 847 N.Y.S.2d 49, 53 (N.Y. App. Div. 2007).

performance tests completed upon Acceptance "confirmed that construction of the plant had been successfully completed and that *the plant was fully functional and ready for commercial operation*." Nawaz Aff. ¶ 13 (emphasis added). New York law and industry usage establish that this moment of Acceptance – when the Project became available for use – marks the earliest possible starting time for statute of limitations purposes.[7]

In view of the foregoing, the earliest date on which the statute of limitations for breach of contract claims could have begun running here was the date of Acceptance. Bechtel concedes that Acceptance did not occur until September 27, 2002. Petition ¶ 14. Accordingly, UEGA's arbitration demand was timely under New York law.

### B.    New York's "Borrowing Statute" Does Not Render UEGA's Contract Claims Untimely

Bechtel's attempt to import a purportedly shorter limitations period for contract claims under Brazilian law fails for two reasons. First, the Contracts prohibit such an application of Brazilian law. Second, Brazilian law does *not* provide a shorter limitations period here.

### 1.    New York's Borrowing Statute Does Not Apply Here

The Umbrella Agreement provides: "The parties hereto intend that the Contracts shall be governed by and construed in accordance with the laws of the state of New York, *excluding conflict of law rules which may direct the application of the laws of any other jurisdiction*, and each party hereto agrees not to assert a defense in any proceeding that is not subject to the laws of the state of New York or that any of the Contracts are governed by or are to be construed in accordance with the laws of any other jurisdiction." Umbrella Agreement, § 26.1 (emphasis

---

[7] Moreover, Bechtel was entitled to a substantial bonus in connection with achieving Acceptance, though not for achieving Mechanical Completion. *See* Equipment Contract Art. 17.10. This further underscores the importance of the Acceptance milestone.

added).  That language is consistent with the language of the individual Contracts, each of which states that "[t]he law which is to apply to the Contract and under which the Contract is to be construed is the laws of the state of New York, *without regard to that jurisdiction's conflict of laws rules*."  Contracts, Art. 39.1.1.

Bechtel's attempt to use New York's borrowing statute, CPLR § 202, to apply a Brazilian limitations period to UEGA's contract claims flies in the face of the Contracts.  The borrowing statute is a conflicts rule, not a procedural statute of limitations.  *See In re Agent Orange Product Liability Litigation*, 597 F.Supp. 740, 810 (E.D.N.Y.1984) (New York's borrowing statute is "a special conflict of laws provision applicable to causes of action accruing without the state"); *O'Keefe v. Boeing Co.*, 335 F.Supp. 1104, 1110 (S.D.N.Y. 1971) (identifying New York borrowing statute as among the State's conflict of laws rules); *see also Reinhard v. Textron, Inc.*, 516 P.2d 1325, 1327 (Ok. 1973) (Oklahoma borrowing statute "like other similar statutes, should be considered a conflicts rule and not a procedural statute of limitations").[8]

### 2.    In the Alternative, UEGA's Contract Claims Are Also Timely Under Brazilian Law.

Even if the "borrowing statute" were a basis for considering Brazilian limitations periods here, UEGA's contract claims would still be timely.  Although Bechtel has argued that UEGA's claims expired on September 27, 2008[9] under Article 618 of the Brazilian Civil Code, this is a misstatement of Brazilian law.

---

[8] Although the Contracts prevent application of the borrowing statute, that result is nonetheless consistent with the statute's underlying purpose, which is to prevent forum shopping.  *See Antone v. General Motors Corp.*, 473 N.E.2d 742, 745 (N.Y. 1984) ("the primary purpose of [N.Y. C.P.L.R.] 202 . . . is to prevent forum shopping by a nonresident seeking to take advantage of a more favorable statute of limitations in New York").  Here, the Contracts require that all claims arising out of or relating to the Contracts be arbitrated before the ICC in New York.  Contracts Art. 37.2.  UEGA has simply complied with the Contracts  and cannot be accused of forum shopping.

[9]  It is notable that Bechtel bases its Brazilian statute of limitations argument on the date of Acceptance, September 27, 2002, rather than the date of Mechanical Completion.

As explained in the Declaration of Gustavo Adolfo Almeida de Almeida, UEGA's claims against Bechtel are not subject to Article 618 but, instead, are subject to a statute of limitations with a three-year "discovery" rule that had not run as of the date the Arbitration commenced.

- As an initial matter, there is significant doubt as to whether Article 618 applies to UEGA's contract claims. Article 618 is applicable only to a specific category of "contrato de empreitada." Bechtel's Brazilian attorney inaccurately translates this phrase as "turn-key contract" but a more appropriate translation is "work contract." A turn-key project, such as the Project, is a broader concept than a *contrato de empreitada* and usually refers to complex relationship comprising multiple contracts and multiple tasks (not necessarily falling under the concept of "work contract"). Almedia Decl. ¶ 5.

- Moreover, Article 618 simply establishes a five-year period during which a builder has *strict liability* with respect to the stability and safety of the construction. After this period, the builder might still be liable for such defects, but its liability will no longer be triggered regardless of fault. *Id.* at ¶¶ 6-7.

- The guarantee provided by Article 618 regards only the stability and safety of the construction resulting from the work of the contractor. In other words, it is a guarantee against defects that could compromise the integrity of the construction and even result in its collapse. *Id.* at ¶ 8.

- Under Brazilian law, indemnification for problems that are unrelated to the concepts of "stability and safety," but instead are more appropriately characterized as relating to inadequate performance under a contract, are subject to the "ordinary" statute of limitations period. *Id.* at ¶¶ 9-10.

- Under the Brazilian Civil Code, the "ordinary" limitations period is three years for all claims of "civil reparation," a concept that comprises indemnifications arising both from inadequate performance of contracts and from tortious conduct. Article 206, § 3°, V. The Code was revised in 2002 and case law is still unsettled, but there is precedent from the Supreme Court of the State of São Paulo holding that the three-year term should begin only *after* the end of Article 618's five-year guarantee term, which would amount to an eight-year liability period. *Id.* at ¶¶ 11-12.

- In any event, Brazilian case law recognizes that a limitation period may not commence before the moment when a party could claim the right or the indemnification. Therefore, the "ordinary" three-year period would start only after the defect becomes manifest. Here, that event was in January 2008, when the STG's hidden defect became evident to UEGA. *Id.* at ¶¶ 13-17.

- UEGA filed its arbitration demand on September 29, 2008, less than ten months after the January 13, 2008 incident at issue in the Arbitration. Accordingly, its breach of contract claim would be timely under Brazilian law. *Id.* at ¶ 18.

- 19 -

Because Brazilian law would *not* subject UEGA's contract claims to a shorter limitations period, the Court should deny the Petition and compel Bechtel to participate in the Arbitration.

### C.    UEGA's Tort Claims Are Not Governed by New York Law

In contrast to the parties' express agreement that New York law would govern contract claims, they reached no agreement about tort claims relating to the project (other than their agreement that all disputes relating to the Contracts must be arbitrated). Although Bechtel now attempts to rely on New York's borrowing statute to apply a three-year tort limitations period, Petition at 19-20, the Contracts *prohibit* application of the borrowing statute for reasons addressed above. Therefore, it will be up to the arbitrators to decide which limitations period (if any) to apply to UEGA's tort claims. That may include a three-years-from-discovery period for tort claims under the law of Brazil, which is, after all, the location where the tortious activity took place, where the January 2008 incident occurred, and where UEGA has suffered resulting damages. *See* Almeida Decl. at ¶ 19. Once again, the Court should leave this matter for the arbitrators to decide.

B3646333.15

## <u>CONCLUSION</u>

For all the foregoing reasons, UEGA requests that its Application to Compel Arbitration

be granted and that Bechtel's Application for Permanent Stay of Arbitration be denied.

UEG ARAUCARIA LTDA.
By its attorneys


/s/ Ronald E. Goodman
Ronald E. Goodman (RG-0515)
FOLEY HOAG LLP
1875 K Street, NW, Suite 800
Washington, DC  20006-1238
Tel: (202) 223-1200

and

Blair C. Fensterstock (BF-2020)
FENSTERSTOCK & PARTNERS LLP
30 Wall Street
New York, NY  10005
Tel: (212) 785-4100
E-mail: BFensterstock@fensterstock.com

Dated: July 20, 2009

B3646333.15